BRUNOT, Justice.
 

 This is an appeal by the plaintiff from a judgment dismissing the suit against the defendant, for want of jurisdiction, and in favor of the interveners, decreeing them to be the owners of and entitled to the possession of the seized property. Interveners have answered the appeal and ask that their right to sue for damages for the wrongful seizure of their property be reserved to them.
 

 The defendant was charged with a criminal offense. He was arrested and held in custody pending the furnishing of a $10,000 appearance bond. The plaintiff became the defendant’s surety on the bond, and the defendant was released from custody. When the case was called for arraignment and trial, it was ascertained that the defendant was a fugitive from justice. Thereupon the appearance bond was forfeited. When this suit was filed, the plaintiff had not paid the sum of the bond, but there was an existing judgment against it for that sum-. In an effort to protect itself against loss, the plaintiff filed this suit and attached a $20,000 mortgage note, executed by Mrs. Rosalia Di Benidetto, wife of Nicholas Polizzi, and Nicholas Polizzi, and certain insurance policies, covering loss by fire, on the mortgaged properties; the said note and insurance policies being, at the time of the seizure under the writ of attachment, in the possession of the Continental Bank & Trust Company, of New Orleans, as the holder thereof for the Equitable Casualty & Surety Company, in liquidation, for delivery to E. N. Cobb and Adam Smith, Jr., upon their execution of a joint’ receipt therefor. After the seizure, the Polizzis, by way of intervention and third opposition, asserted title to and ownership of all of the seized property. It is not necessary to detail the several pleadings, all of which were regular, because, except for a plea of
 
 *207
 
 estoppel, which we think was correctly overruled, the issues presented are merely issues of fact. The trial judge reviewed the facts exhaustively, and . we think he correctly reached the conclusion that the Scontrinos were the real owners of the seized property, but that the interveners were the record owners of the property affected by'the mortgage, and that the mortgage note and insurance policies were delivered to the Equitable Casualty & Surety Company’ to collateralize bonds that had been judicially canceled, and had therefore served their purpose.
 

 After reviewing the facts leading up to the execution of the $20,000 mortgage and note identified therewith, the trial judge says:
 

 “ * * * Adam Smith and two of his confederates and co-criminals ran up against Uncle Sam’s laws in the Western District of Louisiana and were arrested under the jurisdiction of the District Court-for the Western District of Louisiana and were incarcerated at Lake Charles. Smith made application for bond to the Equitable Casualty & Surety Company through its general agent in Louisiana, Mr. E. N. Cobb, and informed Cobb that his mother-in-law and father-in-law would put up the cash to secure the $5,000 bond which the United States authorities in Lake Charles demanded. Mrs. Scontrino produced the $5,-000 in cash plus the $100 premium and $30 for expenses, and deposited this cash with the Equitable Company through Mr. Cobb, its agent and general manager in Louisiana, and thereupon the necessary bond was executed in the Western District of Louisiana and Adam Smith was released from the prison in Lake Charles. It would appear that he immediately came to this city and undoubtedly applied at once to his parents-in-law, whose sole interest, it appears, in him was that he was their son-in-law, the husband of their daughter, in order to obtain the release of his two confederates, still in jail in Lake Charles, Woods and Brian, and it is perfectly clear that, through negotiations with the Seontrinos, his mother-in-law and father-in-law, it was arranged that tfie Scontrinos would execute a $20,000 mortgage on their property, which would be used first to release the $5,-000 cash collateral then in the hands of the insurance company; second, as collateral to secure bonds for the two confederates of Adam Smith, namely, Woods and Brian.
 

 “The two Polizzis went before Mr. Cobb, Notary, and executed the mortgage. * * 9
 

 “The mortgage note went directly, as soon as the marks of the two Polizzis had been attached thereto, into the hands of Mr. Lloyd J. Cobb, acting for the Equitable Casualty & Surety Company. Thereupon, the bonds for Woods and Brian were executed and these two accused were delivered from prison.
 

 “In due course, the bonds for Adam Smith, Woods and Brian were cancelled and the Equitable Casualty & Surety Company was under no obligation whatsoever. Mr. E. N. Cobb, the agent and general manager of that corporation, had transmitted this collateral, which was the mortgage note with a copy of the act of mortgage and the fire insurance policies on the improvements on the mortgaged property, to the home office of his corporation in New York, where it went into the portfolio and vaults of the New York corporation, and it was there when the three bonds in question were cancelled and the lia
 
 *209
 
 bility of tbe insurance company thereon ceased and terminated.
 

 “The evidence is perfectly plain that thereupon the Scontrinos became active and sought and demanded the return of the mortgage note. In the meantime, in January of 1931, the insurance company in New York had failed and the Insurance Department of the State of New York had taken charge of it in course of liquidating its affairs. On demand being made for the return of this collateral, the liquidators refused to do so, on the ground that the books showed that there were premiums due on these bonds which had not been paid. As a matter of fact, I understand that the premiums had been paid to Miller & King but had not been acecunted for, and considerable delay ensued — so much so that Mr. Grace, an attorney of this city, wa§ brought in. He testified that he had conferences with the Scontrinos and that he undertook to pro-, duce all the proof necessary for the return of the collateral, an arrangement was made to pay some small amount, a hundred or two hundred dollars, in lieu of the seven or eight hundred dollars' claimed by the liquidators in New York, and Mr. Grace testifies that when it was all arranged, he wrote to the liquidators, telling them to send the collateral either to him or to Mr. Oobb, and for some reason unknown to him, they selected Mr. Cobb to whom to transmit the mortgage note, instead of him. * * *
 

 “This mortgage note was executed in June of 1930. All this took place subsequent, of course, to that date. When the Equitable Casualty & Surety Company failed and was taken over by the insurance authorities of New York, Mr. E. N. Cobb ceased to be its agent, but, it seems, secured the agency of the plaintiff in this ease, the Public Indemnity Company.
 

 “Finally, on September 27, 1931, while this collateral note, which had never been in the possession of Adam Smith but had been in the possession first of the Equitable Casualty
 
 &
 
 Surety Company and second in the posses sion of the liquidators of that concern, was still in New York, in the possession of th' liquidators, Adam Smith being again arrested by the Federal authorities for bootlegging applied to Mr. Cobb for a bail bond, and Mr. Cobb, on behalf of the Public Indemn ty Company, executed that bond, having no collateral whatever in his possession, the collateral being- in the possession of the liqui dators of the corporation with which all oí his contact had ceased months and months previous. Now, he states that he did so for three reasons: First, that Adam Smith toll him that he, Adam Smith, was the genui ip and bona fide owner of that $20,000 mortgage note for value; second, that Adam Smith assured him that he could use that note as collateral for a $10,000 bond which Adam Smith needed, arid third, in his absolute belief that the liquidators would forward the note to him and that he would regain possession of it and it would serve as collateral for the $10,000 bond executed by him on September 27, 1931. He gives no evidence whatsoever that the Scontrinos, the real owners of the note, ever intimated to him that they would consent that the $20,000 mortgage note should be used for the bond of Adam Smith. He admits, on the contrary, that he was fully cognizant of the energetic efforts made by the Scontrinos to regain possession of the note.
 
 *211
 
 From the time in January, 1931, that the Equitable went into the hands of liquidators up to the day in September when he executed this bond for Smith, the evidence, in my opinion, is perfectly clear and absolutely plain that the Scontrinos are the equitable owners ■of that note. They are the owners of it, and the Polizzis in this case were nothing but their agents. * * *
 

 “Now, in equity, when one is put on notice •of facts sufficient to cause him to investigate .and find out the truth, he is charged with knowing the truth that he could have discovered by investigation in the same manner and to the same effect as if he had made the investigation and discovered the actual truth. In this case, all of the history which I have recited, coupled with the fact that I have not heretofore mentioned, but which is in the record, that Oobb visited the house of the Scontrinos on scores and scores of occasions, he knew that Adam Smith was the son-in-law of these people and had been for about three years, he knew that Adam Smith, upon being released from the Lake Charles-prison on the bond furnished on $5,000 of cash security, had returned to this city and had procured the confection of this mortgage noté and its •delivery to the Equitable Casualty & Surety •Company and he knew that the three bonds in question had been executed thereunder, or rather, that the $5,000 cash had been released to the Scontrinos and two additional bonds had been furnished, and he knew that these .bonds had been cancelled and he knew that thereupon the Scontrinos had, as I have repeatedly said, energetically sought to have the mortgage note returned to them, was ample to put him on notice and on investigation, and the slightest investigation would have made it apparent to Mm, as it should have been already apparent to him, that this was simply a mortgage confected for a purpose, which purpose it had served. I can find nothing in this record that will justify me in holding that any action of the Scontrinos in this case was such as to mislead, delude and receive Mr. Cobb into believing that the mortgage note was the property of Adam Smith and that Adam Smith had a right to tell him that on thj return of the mortgage note from New York he could use it as collateral for the Public Indemnity Company in the bond which that corporation furnished him in the sum of $10,000.”
 

 Our review of the record convinces us that the trial judge has correctly resolved the facts, but we think he inadvertently omitted to reserve to interveners, as prayed for in their petition of intervention, the right to sue the plaintiff for such damage as they may have suffered by reason of the wrongful seizure of their property, and the judgment appealed from is therefore accordingly amended, and, as thus amended, it is affirmed, at appellant’s cost.
 

 O’NIELL, O. J., dissents.
 

 ST. PAUL, J., absent